UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-415 (CRC) |
| v. : | |
| : | |
| DAVID M. GARY, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant David Gary to two months of incarceration, at the low-end of the applicable guideline range, 12 months of supervised release, 60 hours of community service, $500 in restitution, a fine, and a $25 special assessment.

**I.     Introduction**

Defendant David Gary, a 60-year-old telecommunications technician and Navy veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Gary pled guilty to a violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct within a Restricted Building. The government's recommended sentence is supported by the defendant's face-to-face confrontation with Capitol Police as soon as he entered the Capitol Building and his demonstrated awareness that his and other rioters' presence inside the Building would disrupt the certification of the Electoral College.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Gary's crime support a sentence of two months of incarceration in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, Doc. 36

*Defendant Gary's Role in the January 6, 2021 Attack on the Capitol*

After travelling to Washington, D.C. from his home in California, Gary arrived early to the National Mall on the morning of January 6, 2021 for President Trump's "Stop the Steal" rally. At the conclusion of the rally, Gary walked from the area around the Washington Monument towards the west front of the Capitol Building. There, he climbed over a stone wall near the Peace Circle, at the northwest corner of Capitol Grounds.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Despite many indications that the Capitol Building and Grounds were closed to members of the public that day, Gary pressed on from the Peace Circle and eventually forced entry into the Building through the Senate Wing Door at approximately 2:48 p.m. *See* Image 1. Gary forced his way into the building just 36 minutes after this same door had initially been breached. At 2:48, a large group of Capitol Police Officers had assembled to re-secure the door and attempt to keep any additional rioters outside of the building. But in spite of these officers' best efforts, Gary and a crowd of rioters pushed through the line of officers, allowing dozens of rioters to stream into the building after them.



*Image 1: Gary (circled in yellow) forcing entry into the U.S. Capitol Building in the face of police presence (in green box)*

Once inside the building, Gary stepped towards the front of the group of rioters and began yelling and gesturing at the police officers in front of him. *See* Images 2 and 3. Roughly ninety

seconds after he entered the building, he removed his facemask to yell at officers further. *See* Image 3.



*Image 2: Corridor inside the Senate Wing Door on CCTV; Gary circled in yellow confronting officers*



*Image 3: Corridor inside the Senate Wing Door on CCTV; Gary circled in yellow removing his face mask to yell at officers*

Gary remained in the corridor just inside the Senate Wing Doors for several minutes, yelling and gesticulating at the assembled Capitol Police officers. At approximately 3:01 p.m., Gary also appeared on another rioter's livestream from the Capitol Building. *See* Image 4. During that livestream, Gary can be heard saying: "I'm sure they had to evacuate. If we came in, they evacuated. For security. They're going to evacuate, that's just the rules. We breached the building … we're gonna go.  … Nobody here. It's a vacant building."

5



*Image 4: Gary inside the Senate Wing Door foyer, asserting that Members of Congress must have evacuated the building because of the breach*

Given the hordes of rioters streaming into the building by this point, the police officers were not able to contain the rioters, so Gary proceeded deeper into the building. Accordingly, U.S. Capitol Police closed-circuit television ("CCTV") captured Gary in several locations throughout the building, including in the Crypt at approximately 3:04 p.m.

By 3:13 p.m., Gary had returned to the corridor inside the Senate Wing Door, and he exited at 3:14 p.m. by climbing through a broken window. *See* Image 5. After exiting the building, Gary continued to remain on the terracing of the Capitol Building as the crowd chanted and cheered against police officers. *See* Image 6. Phone records show that Gary remained on Capitol Grounds until roughly 6:30 p.m. that night.



*Image 5: Gary (circled in yellow) exiting the Capitol Building through a broken window*



*Image 6: Gary (circled in yellow) in the crowd on the Upper West Terrace after exiting the building*

*Social Media*

Prior to the events of January 6, Gary had posted a photograph to his Instagram account showing a Trump baseball hat with a bottle of "Kraken" rum, in an apparent reference to debunked theories of widespread election fraud espoused by some supporters of President Trump. *See* Image 7.



*Image 7*

*The Charges and Plea Agreement*

On January 16, 2024 Gary was charged in a complaint with Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Disorderly Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building or

Grounds, 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

On September 12, 2024, the United States charged Gary by a one-count Information with violating 18 U.S.C. 1752(a)(2). On September 25, 2024, pursuant to a plea agreement, Gary pleaded guilty to Count One of the Information. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.  Statutory Penalties

Gary now faces sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

9

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4 | 10 |
| Zero Point Offender (U.S.S.G. §4C1.1) | -2 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 6 |

*See* PSR ¶¶ 37-47.

While the Government concedes that Section 4C1.1 applies to Gary, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. I*See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").  Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available

at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Gary's criminal history as a Category I. PSR ¶ 50. Accordingly, the U.S. Probation Office calculated Gary's total adjusted offense level, after acceptance, at 6, and his corresponding Guidelines imprisonment range at 0-6 months. PSR ¶¶ 94. Gary's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 2 months of incarceration and 12 months of supervised release.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gary's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gary, the absence of violent or destructive acts is not a mitigating factor. Had Gary engaged in such conduct, he would have faced additional criminal charges.

Here, Gary breached the Senate Wing Door when a large group of police officers were obviously guarding the door and attempting to keep rioters outside. He did so just half an hour after the door had first been breached by rioters at a time when Vice President Pence had just been evacuated and members of Congress were still in the process of being evacuated to safety. He stood there, yelling at sworn police officers, while elected representatives huddled under their desks or were evacuated from the House and Senate chambers. More, Gary *knew* that the rioters' presence in the building meant that the nation's elected representatives would have had to evacuate, based on his own contemporaneous statements to others rioters.

12

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Gary's History and Characteristics

As set forth in the PSR, Gary has no criminal history. The PSR describes a stable home life and upbringing, as well as a decades-long, loving marriage. And Gary served honorably in the United States Navy for several years, beginning in 1981. PSR ¶ 72.

Gary's crimes on January 6 appear to be an isolated event in an otherwise law-abiding and family-oriented life (aside from decades-old controlled substance use). Thus, there is very little in his background that excuses his culpability for his criminal conduct on January 6.

While Gary's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Gary was well aware of the importance of security around restricted government buildings. His voluntary decision to storm a guarded government building is disturbing in light of his former military service and training.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that Gary has accepted responsibility for his conduct on January 6 by pleading guilty, and the PSR includes a brief statement by Gary in which he reiterates this acceptance. *See* PSR ¶ 36. Gary's acceptance, however, falls short of genuine remorse. He says he accepts responsibility for "parading and protesting on Federal property" and admits that he "should not have trespassed." *Id.* He notes that his conduct has affected him and his family, and that he has "wasted government resources on [his] careless actions." *Id.* This statement does not come close to demonstrating genuine remorse for his conduct on January 6 and does not show that

Gary fully understands the damage and violence that he and the other rioters collectively caused. He is primarily sorry for the impact his conduct has had on him and his family, not the impact that his and others' conduct had on the police officers, for example, whom the mob terrorized that day.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Gary based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gary has pleaded guilty to Count One of the Information, charging him with Disorderly Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences amongst all January 6 cases. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Galloway* (22-cr-12 (CRC)), Galloway also breached the Capitol Building near the Senate Wing Door shortly after the initial breach, had previously served his country in uniform, and penetrated deep inside the Capitol into the Crypt before he eventually exited. *See* 22-cr-12, Doc. 31 (Gov't Sent. Mem) at 3-7. There, the government sought and this Court imposed a term of incarceration of 30 days, after Galloway pled guilty to a similar but not identical crime—disorderly conduct within a Capitol Building in violation of 40 U.S.C. § 5104. Gary's conduct on January 6 was more culpable than Galloway's, and warrants a lengthier sentence, because at the time of Galloway's entry into Capitol, police officers were *not* stationed immediately at the Senate Wing Door as they were at the time of Gary's entry. Gary's entry, by contrast, was part of and enabled by a group effort to oppose and interfere with law enforcement. Once inside, Gary continued to attempt to berate police officers who were only trying to do their job to protect the Capitol and the individuals inside.

In *United States v. Albert Ciarpelli*, 23-cr-398 (CKK), Ciarpelli breached the Capitol Building through the Senate Wing Door at approximately 2:13 p.m., with the first group of rioters to enter the building. *See* 23-cr-398, Doc. 72 (Gov't Sent. Mem.) at 7-9. Like Gary, Ciarpelli yelled at officers inside the building and made his way through many areas of the Capitol. Unlike Gary, Ciarpelli had also confronted officers outside of the Capitol as he approached the building from the west front. Ciarpelli pled guilty to Entering or Remaining in a Restricted Building, and the Court sentenced him to 90 days of incarceration. Ciarpelli is a useful comparator as both he and Gary pled guilty to single counts of violating § 1752, based in large part on their direct confrontations with law enforcement on January 6 and their contributions to critical breaches of the Senate Wing Door.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.  Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gary must pay $500 in restitution, which reflects in part the role Gary played in the riot on January 6.[4] Plea Agreement at ¶ 8-9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

updated by the Architect of the Capitol, USCP, and MPD.) Gary's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 115.

## VII. Fine

The defendant's conviction for a violation of 18 U.S.C. § 1752(a)(2) subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Gary has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The analysis in the PSR shows that Gary has a negative monthly cash flow balance, which ordinarily would suggest an inability to pay a fine. *See* PSR ¶ 77, 92. The PSR also discloses, however, that Gary owns a substantial Roth IRA account and other investment accounts with significant balances. *See* PSR ¶ 77. Accordingly, the government respectfully recommends that the Court consider imposing a modest fine at the low end of the guidelines range to reflect the seriousness of Gary's offense. The guidelines fine range here is $1,000 to $9.500. U.S.S.G. § 5E1.2(c).

## VIII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Gary to two months of incarceration, at the low-end of the applicable guideline range, 12 months of supervised release, 60 hours of community service, $500 in restitution, a fine, and a $25 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Gary's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Katherine E. Boyles
Katherine Boyles
Assistant United States Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Katherine.Boyles@usdoj.gov
Phone: 203-931-5088